In the matter of P., a solicitor of the court of chancery.

[Decided July 8th, 1914.]

1. It is a contempt for a solicitor to insert in a decree, after it has been signed by the chancellor, any provisions, though they are immaterial.

2. Where a solicitor inserted in a decree, after it had been signed by the vice-chancellor, some rather immaterial provisions similar to others which. had been stricken out, and informed the vice-chancellor of his action. stating that he presumed it would meet with his approval, the solicitor, while guilty of contempt. does not merit disbarment, his good faith tending to excuse and purge his offence.

In re contempt of court.

WALKER, CHANCELLOR.

P., a solicitor in chancery, represented defendants in a suit before one of the vice-chancellors, in which they filed a cross-bill having for its object the cancellation of the mortgage described in the bill of complaint. The matter being decided in favor of the defendants represented by P., he presented to the vice-chancellor a form of decree adjudging that the mortgage "be delivered up for cancellation, and the clerk of the county of * * * is hereby directed to cancel said mortgage of record."

P. presented the draft of decree in person and the vice-chancellor struck out the concluding words "and the clerk of the county of * * * is hereby directed to cancel said mortgage of record," for the reason that the county clerk was not a party to the suit, and that, therefore, no decree could be made against him. P. withdrew, taking the decree with him for filing in the clerk's office, and afterwards interlined in it, in his own handwriting, after the word "cancellation," which was the concluding word of the decree as amended by the vice-chancellor, the words "and that the same be canceled of record," so as to make the decree read that the mortgage "be delivered up for cancellation, *and that the same be canceled of record,*" instead of simply that it "be delivered up for cancellation," as it was made to read by the vice-chancellor when he signed the advisory certificate at the foot thereof. The decree was subsequently signed by the chancellor, without knowledge of the solicitor's action.

This conduct of P. amounted to a contempt of court.

Among the instances of contempt mentioned by Blackstone are:

"Those committed by attorneys and solicitors, who are also officers of the respective courts; by gross instances of fraud and corruption, injustice to their clients, or other dishonest practice. For the malpractice of the officers reflects some dishonour on their employers; and, if frequent and unpunished, creates among the people a disgust against the courts themselves." *4 Bl. Com. 284.*

In *1 Bouv. Dict. (Rawle's Rev.) 420,* it is said:

"Courts of justice have an inherent power to punish all persons for contempt of their rules and orders, for disobedience of their process, and for disturbing them in their proceedings."

The conduct of the solicitor before me, subsequent to his contumacious act, mitigated, while it did not excuse, his contempt.

The decree was advised by the vice-chancellor on March 30th, 1914, and four days later, April 3d, 1914, P. wrote the vice-chancellor a letter informing him of what he had done. What he said in the letter can best be set forth by copying the letter itself, which is short. It reads as follows:

"I am sending you herewith a copy of the final decree which you gave me in the above case on the 30th day of March. Please note the words in quotation marks. You will recall that I suggested that the decree direct the Clerk to cancel the mortgage but you stated that the Clerk not being made a party you could hardly do that and, therefore, the language which you used was as follows: 'Be delivered for cancellation of record.' I have made the phrase read, 'Be delivered up for cancellation and that the same be cancelled of record.' This is part of the quotation which I above refer to. This, I am sure, is what you meant and I had no hesitation in adding the extra words."

The solicitor having been before the vice-chancellor for the purpose of settling the decree, and the vice-chancellor having struck out the clause above mentioned for the reason which he stated, it is beyond my comprehension to understand the audacity evinced by counsel in deliberately writing in the decree over the vice-chancellor's signature words by which he doubtless intended to secure the accomplishment of the very thing the vice-chancellor denied. However, it seems that he did it without corrupt motive as will hereafter appear.

The vice-chancellor, upon receipt of the solicitor's naive letter, enclosed it to me with a letter of his own in which he said:

"While I am loath to burden you with this affair, under the circumstances I think that it is my duty to submit it to you for your consideration. Mr. ——— certainly had no right to alter the language which I formulated myself with my own pen, striking out from his draft of decree the direction that the county clerk cancel the mortgage. You will observe that while the language which I employed merely directed that the mortgage be delivered up presumably to the defendant for cancellation, Mr. ———'s decree puts in a positive mandate that the mortgage 'be cancelled of record.' The words which he inserted can only be regarded as mandate to the county clerk."

Upon the receipt of the vice-chancellor's letter, enclosing the solicitor's, I immediately wrote the latter for an explanation, and he replied by letter in which, among other things, he said:

"After I arrived at my office I examined carefully the decree which he (the vice-chancellor) had advised and I came to the natural conclusion that by inadvertence he had stricken out the following words, 'And the Clerk of the County of  *  *  *  is hereby directed to cancel said mortgage of record,' without leaving the necessary direction, 'To cancel said mortgage of record,' and that by inadvertence he had read the word, 'Cancellation' as 'Cancelled,' and therefore in order to make the decree complete and as I understood he wanted it to be drawn, I added the words which are complained of after the word, 'Cancellation,'  *  *  * 'And that the same be cancelled.'

"It must be perfectly obvious to you and also to Vice Chancellor ———— that I did not intend to deceive the court or to make any alteration of the decree without the consent of the Vice Chancellor. The words which I added were simply words which I considered necessary to properly carry out my suggestion to the Vice Chancellor, that a decree should be entered which might be filed and which would operate as a cancellation of the mortgage, without compelling the Clerk to actually cancel the mortgage on the record, and to which idea and view I thought the Vice Chancellor had agreed, and that he intended that I should have this relief.

"I am exceedingly sorry that Vice Chancellor ———— feels that I have attempted to do anything in contradiction of the decree which he has advised, and that there has been any misunderstanding about the matter. Your letter came as a complete surprise to me and, naturally, I was very much perturbed over its contents."

Subsequently, the solicitor appearing at chambers, was informed by me that I proposed to charge him with contempt of court, and I asked him if he desired to be arraigned on formal charges or whether he would submit the matter on the facts above detailed. He chose the latter course, as well he might, for it is obvious that the facts speak for themselves. His only defence is a disclaimer of intentional wrong-doing. This, as a rule, is no excuse, especially where the facts constituting the contempt are admitted, or where a contempt is clearly apparent from the circumstances surrounding the commission of the act. *9 Cyc. 25.* Disavowal of any intention to commit a contempt may, however, extenuate or even purge the contempt. *Ibid. 26.*

A case quite pertinent is that of *State v. Finley, 30 Fla. 325,* in which it was held:

"While the interlineation into a decree, after it has received the judicial signature, of immaterial words patently omitted therefrom through clerical oversight, may not, in the absence of proof of a bad motive or fraudulent design in the attorney who perpetrates it, be cause for disbarment, still any manner of tampering with the decree of a court after it receives the sanction of the judge's signature, no matter in how small a particular, and no matter how innocent or immaterial the alteration may be, is highly reprehensible and deserves severe punishment. In recognition of the sanctity of judicial decrees, chancery court rule 87 (Florida) has been provided, requiring an order of the court for the correction of clerical mistakes therein, arising from any accidental slip or omission; and an attorney who attempts to accomplish correction otherwise should be dealt with summarily and severely."

And the court, in the opinion, made the following observations:

"As to the second charge, of interlining the words 'of Putnam' in the decree in chancery in the case of *Wood* v. *Peterman et al.,* after it had been signed by the chancellor, although it is denied by the relator that such interlineation was done subsequent to the signing of the decree, still we think that the proof, if not prejudiced, is quite sufficient to establish the fact that it was done subsequently to the signing of the decree. This fact being established, the next question to be considered is, does the evidence show that it was done with that fraudulent, corrupt and bad motive that is necessary to have been shown before disbarment could follow? The evidence shows that the interlineation occurred in that part of the decree that undertook to locate or describe the land involved in the decree; and the interlineation caused the sentence in the decree as signed, 'county and State of Florida,' to read 'county of Putnam and State of Florida.' It is apparent, from the evidence, and from the fact that the decree was in a case pending in Putnam county, that the land involved therein, to whose description the interlineation referred, did in fact lay in the county 'of Putnam;' and it is apparent also from the evidence of the clerk, Frank Wright, that the land was otherwise sufficiently located or described without the words inter-

lined; and from all this it is evident that the omission of the interlined words 'of Putnam,' was a *lapsus pennæ* on the part of the draughtsman who prepared the decree, and that of right it was proper that they should have been put into the decree at the point in which they were interlined, prior to its presentation to the judge for his signature thereon. * * * There was no proof that Mr. Fowler made this interlineation under the impression or belief that it added to or detracted from the substance or form of the decree, or was necessary to give it effect. The omission of the words interlined was so manifestly a clerical oversight and mistake, and in the opinion of both the judge and the clerk of the court did not affect the description of the land or the decree either in form or substance, and the words interlined being such as the law would have supplied from the other contents of the decree, * * * in considering the motive by which Mr. Fowler was actuated in making this interlineation, we might fairly presume that he did it under the impression that the judge would certainly consent to the correction of so palpable a clerical mistake, that when made affected nothing either in form or substance, rather than from any evil design.

"We do not wish it to be understood that we are inclined to condone, palliate, countenance or excuse any manner of tampering with the decree of a court after it obtains the sanction of the judge's signature, even to the crossing of a T or the dotting of an I therein; on the contrary, we think that such a practice is highly reprehensible, and deserves severe punishment, no matter how innocent or immaterial the alteration or change may be. A proper respect for the sanctity of the official judgments and decrees of our courts demands this shall be so; and in recognition of the sanctity of judicial decrees, our (Florida) chancery court rule 87 has been provided, requiring an order of the court for the correction of clerical mistakes in decrees arising from an accidental slip or omission. But when such an interference with a judicial decree is made unauthorized and incautiously, but without any bad motive or fraudulent design, it partakes more of the character of a contempt of the court than of that moral turpitude that stamps the perpetrator as being an unfit person to exercise the office of an attorney."

*State* v. *Finley* was a disbarment case, but the law as laid down by the court is entirely apposite to a case of contempt involving facts of a similar nature.

It can hardly be said of the solicitor in the case at bar, as was said of the attorney in the *Florida Case*, that there is no proof that the interlineation in our decree was made under the impression or belief that it added nothing to or detracted nothing from the substance or form of the decree.

P., the solicitor, as already mentioned, incorporated in his draft of decree as presented to the vice-chancellor, a direction to the county clerk to cancel of record the mortgage in question. The vice-chancellor deliberately struck out that provision, so that the decree read that the mortgage should be delivered up for cancellation, leaving the solicitor to accomplish the cancellation in the best way he could, with or without further litigation. The solicitor, after leaving the vice-chancellor, and out of the presence of the court, deliberately wrote into the decree over the vice-chancellor's signature, a provision *that the mortgage be canceled of record,* hoping and expecting, doubtless, that with that language in the decree he could induce the county clerk to make the cancellation. If not, why did he incorporate such a provision in the decree, and why was he not content with the form in which the vice-chancellor signed it? Nevertheless, I am happy to say that I have been able to conclude—contrary to my original view—that the solicitor, P., can be put within the later observation of the Florida court, where it says that when an unauthorized interference with a judicial decree is made without bad motive or fraudulent design, it partakes more of the character of a contempt of court than of that moral turpitude that stamps the perpetrator as an unfit person for the office of attorney. Therefore, I am enabled to reduce the offence of the solicitor before me, from that which would provoke disbarment proceedings, to an adjudication that he has been guilty of a contempt of court; and I so find and pronounce.

The decree will be restored to the form in which it was originally signed by the vice-chancellor, and the matter of punishment of the solicitor will be reserved for further consideration.