THE STATE OF FLORIDA EX REL. GEO. P. FOWLER, RELATOR, VS. JESSE J. FINLEY, CIRCUIT JUDGE, RESPONDENT.

ATTORNEY, DISBARMENT OF—PRACTICE—PROOF OF BAD MOTIVE NECESSARY.

1. Charges preferred against an attorney for the purpose of disbarring him should be clear, specific and circumstantial, and should be stated with great particularity, that the attorney may know how to defend.

2. In the trial of a proceeding for disbarment of an attorney, the judge, being the arbiter of both the law and facts, should not delegate the taking of evidence therein to a master, commissioner or any one else, but should personally hear the evidence of the witnesses for and against the accused, so that in lending or withholding credence to it he may be governed by the same rules and reasons that influence juries when sitting as triers of facts, from an observance of the manner and deportment of the witnesses.

3. Where the acts charged against an attorney in a proceeding for disbarment are proved to have been committed, but the proof fails entirely to disclose any bad or fraudulent motive for the commission thereof, either from the act itself or from other circumstances, disbarment is not authorized. *State ex rel. Rude vs. Young, 30 Fla.,* 85 11 *South. Rep.,* 514, *cited and approved.*

4. While the interlineation into a decree, after it has received the judicial signature, of immaterial words · patently omitted therefrom through clerical oversight, may not, in the absence of proof of a bad motive or fraudulent design in the attorney who perpetrates it, because for disbarment, still any manner of tampering with the decree of a court after it receives the sanction of the judge's signature, no matter in how small a

particular, and no matter how innocent or immaterial the alteration may be, is highly reprehensible and deserves severe punishment. In recognition of the sanctity of judicial decrees, chancery court rule 87 has been pro,ided, requiring an order of the court for the correction of clerical mistakes therein, arising from any accidental slip or omission; and an attorney who attempts to accomplish correction otherwise should be dealt with summarily and severely.

*Miller & Spencer* for Relator.

TAYLOR, J. :

This cause was instituted in this court at the present term, and at the former hearing (30 Fla., 302, 11 South. Rep., 500) the main facts of the case are fully stated. Our conclusion upon the former hearing was that the relator's alternative writ was defective because it failed to show a clear *prima facie* case of right in the relator, in that it contended that the charges preferred against him upon which he was disbarred were insufficient and invalid, without setting up or presenting to us the contents or language of the charges referred to ; and because it contended further that the evidence before the respondent upon which he based the disbarment did not sustain the charges preferred, but failed to exhibit to us the evidence questioned ; and the relator was allowed to amend his petition and alternative writ. The amenndment has been made, and the case is now before us for the second time, upon the alternative writ as amended and an amended return thereto by the respondent. The relator now

moves for a peremptory writ upon the following grounds : 1st. "That the return of the respondent is wholly and entirely insufficient in law, and, in view of the allegations of the alternative writ, shows no clear' right in the respondent to refuse obedience thereto." 2nd. "That the said return does not set up or show upon what evidence, if any, the defendant acted, or show any valid or legal reason, or sufficient legal proceedings or evidence, to justify the respondent in refusing obedience to said writ." 3rd. "Because the said return does not set up a denial of the facts stated in the alternative writ, or state or show other facts sufficient to defeat relator's right to restoration." 4th. "Because the said return is otherwise informal, and insufficient to defeat relator's rights."

The amended alternative writ alleges the following to be the charges upon which the relator was disbarred : "5th Judicial Circuit of Florida, in and for Putnam county. To the Hon'l. J. J. Finley, judge in and for said Circuit : D. M. Kirby, deputy Clerk Circuit Court for said county, complains of George P. Fowler as follows : 1st. That in a certain chancery cause, wherein A. J. Wood was complainant, and Hennis Peterman *et al.* were defendants, he, the said George P. Fowler, acting as solicitor for complainant, interlined and added to the final decree rendered in said cause, after the signature of the chancellor had been affixed.

"2nd. That in a certain cause in chancery, wherein A. J. Wood was complainant, and Julia E. Roberts

and B. F. Roberts were defendants, the case was carried to final decree and sale, without having had proper and legal service upon the owner of the property, Mrs. Julia E. Roberts ; that George P. Fowler assured the judge in open court that service had been had upon Mrs. Roberts ; that said subpœna was afterwards abstracted from the clerk's office, and that no one but said George P. Fowler had the record and files in said chancery cause at the time said subpœna was taken, and this complainant believes said George P. Fowler did take or make way with said subpœna, he being the party most interested in its disappearance.

"3rd. That in a chancery cause wherein W. W. Rast was complainant, and Minnie A. Estee, W. W. Toller *et al.*, were defendants, said George P. Fowler asked this complainant, D. M. Kirby, to make affidavit to the effect that notice of publication had been sent to W. W. Toller, at Glenwood, Virginia, when said Fowler knew it had not been done, and that he had told this complainant that there was no necessity of it, as the said W. W. Toller was in London, England, beyond the seas. "D. M. KIRBY."

Sworn to and subscribed before me this February 28th, 1891.

COOK CARLETON,
Notary Public State of Florida.

The alternative writ further alleges that upon the filing of said paper with the respondent, he made an

order on the 26th of March, 1891, requiring the relator to show cause before him in open court at Palatka, on the 8th of April, 1891, why he should not be disbarred for the reasons stated in said paper or complaint.

We may as well remark just here, that we are clearly of the opinion that the form and substance of the charges preferred against the relator were entirely too loose, general, vague, indefinite and uncertain to have warranted this order requiring the relator to respond thereto, or to show cause why he should not be disbarred by reason thereof. All the authorities agree and the doctrine is re-affirmed in the former decision of this case, that a charge so grave in its nature must be clear, specific and circumstantial, and must be stated with great particularity, that the attorney may know how to defend. The first of the charges here that this relator was peremptorily called upon to refute, was that in a certain chancery cause, wherein one A. J. Wood was complainant, and Hennis Peterman et al. were defendants, the relator interlined and added to the decree rendered therein, after it was signed by the chancellor. It fails to state what it was that was interlined or added to the decree; fails to give the date of the decree, or the court in which the cause was pending, or any date at or about which the alleged interlineation or addition was perpetrated; not even stating whether the paper tampered with belonged to any of the courts of the State of Florida or

not, or where the alleged wrongful addition thereto was perpetrated; nor whether the same was done with any bad motive or malicious intent.

The second charge was the abstraction of a subpœna from the clerk's office, in a certain cause, wherein A. J. Wood was complainant, and Julia E. Roberts and B. F. Roberts were defendants. This charge does not allege that the relator abstracted the subpœna, but alleges "that said subpœna was afterwards abstracted from the clerk's office, and that no one but said George P. Fowler had the record and files in said chancery cause at the time said subpœna was taken, and this complainant (D. M. Kirby) *believes* said George P. Fowler did take or make way with said subpœna, he being the party most interested in its disappearance." This charge also fails to allege the court in which the cause to which the subpœna belonged was pending, or any dates, or that there ever was in fact any subpœna therein that could have been abstracted, or in what county or state the supposed abstraction occurred, and does not show how or in what manner the relator was interested in its abstraction or disappearance; nor does it allege any bad motive or intent in the abstraction thereof. We have no hesitancy in saying that these charges so framed were entirely too vague, indefinite and uncertain, and too wanting in directness, clearness, particularity and detail to have warranted the respondent in demanding of the relator an

exhibition of any cause why disbarment should not follow as a result thereof. The relator, however, failed to move to quash the charges in the form presented, or otherwise to question their legal sufficiency, but saw proper to answer, denying in detail the charges as made; and, to the first charge, as to the interlineation of the decree, specifies in his answer one interlineation, that of the words "of Putnam," in the decree asserting that it was made by him, but before the decree was signed. Upon the coming in of this answer the respondent made an order referring the matter to Calvin Gillis, Esq., as a special master to take such testimony therein as might be offered "on either side, bearing on the truth or falsity of the complaint made, and to report the same to the court at the earliest practicable time. In proceedings for the disbarment of an attorney, we do not think that this was the proper practice. The power to disbar an attorney for any of the causes justifying such a procedure is inherent in the court itself. The judge sits as the arbiter of both the law and facts in the case. He is the trier; and, so far as the facts are concerned, should occupy the same position of personal presence at the examination of witnesses that a jury does at the trial of anyone charged with crime, so that he may observe the manner of the witnesses, and may give to their evidence credence or disbelief, as a jury does, according as their manner of testifying may indicate prejudice, malice or other sinister motive to subserve.

By delegating the examination of witnesses in the
cause to another, the judge hears the evidence only by
proxy, but still retains the position and powers of
trier of the facts, and deprives the accused of the
right to be confronted with the accusers, before the
tribunal who pronounces upon the facts. In a case
reported in 83 N. Y., 164, for the disbarment. of an
attorney, it was held that such proceedings are of a
public nature and are *quasi* criminal, and that evi-
dence of an absent witness taken under a commission
upon written interrogatories was not admissible, and
that the attorney could be convicted only upon evi-
dence good at common law, delivered if he chooses in
his presence, by witnesses subject to cross-examina-
tion. *In re* Kelly, 59 N. Y., 595. The proper prac-
tice in such cases is for the judge to personally hear
the evidence of the witnesses for and against the ac-
cused, so that in lending or withholding credence to
it he may be governed by the same rules and reasons
that influence juries when sitting as triers of facts.
This manner of trying or getting the evidence in the
case was not objected to at the time, however, by the
relator, but he seems, from the exhibits made in the
amended alternative writ to have gone into the taking
of testimony before the special master without com-
plaint or demurrer thereto.

The amended alternative writ sets out the following,
in substance, as being the evidence taken before the
master, upon which the judgment of disbarment was

based: The master, Calvin Gillis, Esq., filed a statement in substance as follows: That he had devoted about a week to the service of taking testimony in the cause, without compensation to himself or the witnesses; that a great deal of immaterial testimony was taken; that the papers and depositions in the cause are in the custody of the clerk of the Circuit Court for Putnam county. That the parties interested, or some one or more of them, made known to him that there still remained many witnesses to depose in this matter. That he was willing to serve without compensation to purge the bar if necessary, or to vindicate the bar if unjustly accused; but in the present case he begs to be relieved by your honor, when his labors are more than required elsewhere.

In what appears to be an *ex parte* affidavit made before a Notary Public, and admitted and filed with the master as evidence, as is stated, by consent of the relator subject to his right to cross-examine the affiant, Frank Wright, Clerk of the Circuit Court for Putnam county, testified as follows: That on or about the 18th of April, 1890, George P. Fowler brought to his office a final decree in the case of Wood vs. Peterman that had been signed by presiding Judge Finley on the 17th of April, at chambers at Ocala, and asked me to record it as soon as convenient. Mr. Kirby, deputy clerk, took the decree and filed it, soon thereafter started to record it; while he was at his desk recording the decree, Mr. Kirby called to me and said, Mr. Fowler has made a mistake in the decree, having described the land as in the "county and State of Flor-

ida," and he asked me if I thought that affected the decree. I left my table and went to Mr. Kirby's desk and looked at the decree, and saw that it read as above, and told Kirby to go on with the record, as I thought the rest of the description was sufficient to locate the property. Kirby continued the record, but before completing it was called off by some other business and did not take it up again. Some time afterwards Mr. Fowler came to the office and asked for the papers in the case, and took them away with him. When he returned them Kirby opened the package and looked it over and discovered that the words "of Putnam" had been interlined. I looked at the paper again and found such to be the case, and told Kirby not to continue the record until the judge had seen it and had allowed the interlineation. On the 17th of May I wrote to Judge Finley asking instructions as to completing the record, and saying that I awaited his instructions in the premises. Under date of May 22d, Judge Finley wrote acknowledging receipt of my letter, and of the affidavit accompanying it, but that he could not instruct me until the matter had been brought before him in a shape that would authorize him to act. Thus the matter has stood up to the present time. I have not felt justified in completing the record, and the judge has given me no instructions on the subject. With reference to the loss of the subpœna in the case of Wood vs. Roberts, I can not state fully of my own knowledge, as my deputy, Kirby, has charge of law papers in the office, and they seldom come to my notice, but I remember one morn-

ing about the middle of April, 1890, about 8 o'clock, when I reached the office I saw Mr. Fowler sitting near the safe containing law papers, looking over some papers. He left soon after, taking some cases with him; about ten o'clock Mr. Haskell came in and asked to see the Wood vs. Roberts papers, and sat down on the corner of Mr. Kirby's desk to look them over; soon I heard him ask Mr. Kirby where the subpœna was, and he and Mr. Kirby looked through the papers and said they could not find it. After asking if they had looked carefully, I went across the room and looked for myself, but did not find the subpœna, and have not since seen it, although I have made diligent search for it through the office. On cross examination by the relator, he answered that he had never, to his recollection, called Mr. Fowler's attention to the interlineation in the decree, after the same was brought to his attention.

D. M. Kirby, the deputy clerk, testified that on or about the 15th of April, 1890, late in the afternoon of that day, one B. E. Dyson, the deputy sheriff of Putnam county, James S. La Roche and himself were looking over papers in chancery suit of A. J. Wood against B. F. and J. E. Roberts, and more particularly the subpœna with the service returned thereon by the sheriff. I took the subpœna and read the service. The subpœna was placed back among the papers in the safe, and locked it for the night. The next morning Major Fowler entered the office about or shortly after seven or eight o'clock, while La Roche and myself were comparing instruments that had been recorded.

Maj. Fowler asked to see the papers in this case, the safe was then opened for the first time that day, and the papers handed to Maj. Fowler, who took them to another table to examine; a few minutes later he handed me the package and I placed it in the safe. I had not opened the package myself since the night before. At about ten o'clock a. m. of the 16th of April, *I think*, 1890, E. E. Haskell entered the office as attorney for A. J. Wood, and asked for the same papers; I took them from the safe to my desk, and Mr. Haskell opened the papers in my presence, at the same time conversing with him relative to the service. He examined the papers, and the subpœna could not be found; we both examined each individual paper, the safe, the tables, and it could not be found. I had charge of these records and files, and to my knowledge no other parties handled these papers, Maj. Fowler being the only person who opened this package between the evening of the 15th of April, 1890, to ten o'clock A. M. next day. This happened in the court house, in the city of Palatka, Putnam county, Florida. I have never seen the subpœna since, although having made diligent search for it.

J. S. La Roche, a recorder in the clerk's office of Putnam county, testified to the same facts in substance as to the disappearance of the subpœna as did D. M. Kirby; and testified also that some time in April, 1890, his attention was called by the clerk, Mr. Wright, and his deputy, Mr. Kirby, to the omission of the words "of Putnam" in the decree in the case of Wood vs. Peterman that Kirby was then recording in the chan-

cery order-book, and that sometime afterwards, on looking at the decree again, he saw that the above two omitted words had been interlined after the decree had been signed.

Benjamin E. Dyson, in an *ex parte* affidavit copied into the alternative writ as part of the papers in the case, sworn to before a Notary Public, and that has nothing about it to indicate that is was ever filed with the master, or used before the judge, testifies that on the *morning* of the 15th of April, 1890, he entered the clerk's office and asked to see, and was shown by the deputy clerk, the subpœna in the chancery case of Wood vs. Roberts and wife, and that after the sheriff's return of service thereon was read by him and the deputy clerk, the latter placed said subpœna among the other papers in the case and put them in the safe, and then closed the safe and followed him out of the office; and, contradicting his first statement above that it was in the *morning*, he here says that it was about five o'clock P. M., the time of closing the clerk's office.

E. E. Haskell testified in an *ex parte* affidavit made before a Notary Public, and that has no file marks of the master or judge, that on the morning of April 16th, 1890, about ten o'clock, as attorney for A. J. Wood, he called at the clerk's office for the subpœna in the case of said Wood vs. Roberts and wife, but that after diligent search for same, made by him and the deputy clerk, Kirby, the same could not be found; that he

had never seen or handled the papers in the case before that time.

D. M. Kirby, the deputy clerk, upon a second examination, testified to the same facts, substantially, in reference to the interlineation of the words "of Putnam" in the decree, as did the clerk, Mr. Wright.

John E. Marshall, in an *ex parte* affidavit made before a Notary Public, testified for the relator that he had done a great deal of business for Mr. Fowler, acting as special master in chancery in many cases in which Mr. Fowler was solicitor for the complainants, among which was the chancery cause of A. J. Wood vs. Hennis Peterman *et al.* ; that as such special master he did his writing, and business connected therewith, in Fowler's office, and had spent a great deal of time there, and was well acquainted with his methods of doing business; that he was a very careful, industrious, pains-taking and conscientious man in the discharge of his duty to his clients; that it was always the practice of Fowler to carefully compare all decrees, bills and other papers prepared by him, before filing the same in the clerk's office; that he had assisted him in many cases and many times in such work, and that he well remembered assisting him in comparing the supplemental decree in the case of Wood vs. Peterman, the same being signed by the chancellor April 17th, 1890; that he was in Palatka on the 7th of April, 1890, and in Fowler's office, and remembered well, and was sure by reference to dates and memoranda in his possession, that he compared the said supplemental decree

with Fowler on that day, shortly after he had finished drawing the same ; that he called Fowler's attention to the omission of the words "of Putnam" in said decree, and that said Fowler did then and there interline said words in said decree in his presence. Of this fact he was sure and positive, and that he knew that said interlineation was so made by him as stated, and before said decree was signed by the judge or filed in court.

The amended alternative writ avers that the above is all the evidence that was before the respondent in reference to said charges, and that none of said testimony except that of Frank Wright was ever legally or properly before the respondent, the same never having been filed by the master as a part of his report.

The respondent for answer to this amended alternative writ refers the court to his answer to the original writ herein, and asks that the same may be taken and considered as his return to the writ as amended. Neither in the return to the original writ or to the amended writ is it denied that the foregoing is all the testimony upon which the respondent acted in disbarring the relator. We must take it as true, then, that what we have given above is, in substance, all the evidence before the respondent bearing upon the two charges upon which the disbarment was predicated. The question, then, to be considered is, was this evidence sufficient under the law to warrant the court below in visiting upon the relator the severe penalty of disbarment that is always deeply humiliating to an attorney, and often most disastrous, not only to him-

self, but to his unoffending family dependent upon his professional efforts for their very existence.

In the judgment or order of disbarment, the relator is adjudged to be "guilty of" abstracting the subpœna in chancery in the case of Andrew J. Wood vs. Benjamin F. Roberts and wife, pending in the Circuit Court of Putnam county; and also of interlining the words "of Putnam" in the decree in chancery in the case pending in Putnam county Circuit Court of Andrew J. Wood vs. Hennis Peterman *et al.*, after said decree had been signed by the judge. In the case of State *ex rel.* Rude vs. Young, decided at the present term (30 Fla., 85, 11 South. Rep., 514), it is held that "no court should, in the exercise of original jurisdiction, disbar an attorney upon a charge of this character, establishing, if proved, his unfitness morally to be entrusted with the responsibilities of the office, unless the testimony sustains it clearly, both as to the act and the *bad motive*." Testing the evidence before the respondent by this rule, we fail to find in it anything that even suggests a bad or fraudulent motive or purpose in the relator for the commission of the acts adjudged against him. In the matter of the abstraction of the subpœna in chancery in the case of Wood vs. Roberts and wife, the evidence does not even suggest any purpose, reason or motive that the relator could have had for its abstraction or disappearance. What benefit or advantage to himself or anyone else could have been reaped out of its disappearance, or what loss or injury could have flown therefrom to anyone is not even hinted at in the evidence. He is not

shown by the evidence to have been interested in the cause to which the lost paper belonged in any way, either as party thereto, or attorney therein for any of the parties, or otherwise. So far as his motive was concerned for the abstraction of this paper, the evidence is entirely insufficient. If there had been any evidence before us to show that the relator, before the decree was rendered in the case to which this missing subpœna belonged, asserted to the judge, as an inducement to the signing of such decree, that service of subpœna had been made upon Mrs. Roberts, one of the defendants therein, as was charged, or if there had been any proof to show that Mr. Fowler was in any way, either personally or representatively, interested in upholding the decree predicated upon the proper service of such missing subpœna, or as purchaser of the property thereunder, or if there was any proof showing that he had any interest or design whatsoever in the disappearance of said subpœna, we should have been bound under the proofs before us to sustain the respondent in the order of disbarment. But, so far as the proof goes, we are shown no interested or bad motive or reason for his taking it, or having it to disappear at all. It seems from the evidence that the clerk of the court of Putnam county was in the habit of permitting Mr. Fowler to take out of his office the original papers on file there. In the absence of any proof that he took this subpœna with an interested or bad motive, we think that to this extent the order of disbarment was unwarranted.

As to the second charge, of interlining the words "of Putnam" in the decree in chancery in the case of Wood vs. Peterman *et al.*, after it had been signed by the chancellor, although it is denied by the relator that such interlineation was done subsequent to the signing of the decree, still we think that the proof, if not prejudiced, is quite sufficient to establish the fact that it was done subsequently to the signing of the decree. This fact being established, the next question to be considered is, does the evidence show that it was done with that fraudulent, corrupt and bad motive that is necessary to have been shown before disbarment could follow. The evidence shows that the interlineation occurred in that part of the decree that undertook to locate or describe the land involved in the decree; and the interlineation caused the sentence in the decree as signed, "county and State of Florida," to read "county *of Putnam* and State of Florida." It is apparent from the evidence, and from the fact that the decree was in a case pending in Putnam county, that the land involved therein, to whose description the interlineation referred, did in fact lay in the county "of Putnam;" and it is apparent also from the evidence of the clerk, Frank Wright, that the land was otherwise sufficiently located or described without the words interlined; and from all this it is evident that the omission of the interlined words, "of Putnam," was a *lapsus pennæ* on the part of the draughtsman who prepared the decree, and that of right it was proper that they should have been put into the decree at the point in which they were inter-

lined, prior to its presentation to the judge for his signature thereto. In the order of disbarment the respondent also expresses the opinion that the omission of the interlined words might not have vitiated the decree. If the decree then, (and it is not before us in the record,) was just as perfect without the interlined words as it would have been had they been originally included therein, then it follows as a necessary sequence that the interlineation was an immaterial one. It added nothing to the effect of the decree, nor detracted anything from it. It did not vary the rights or interests, duties or obligations of any of the parties to it, or of anyone else; nor did it give rise to any opportunity for wrong to any one, or deprive anyone of any right under it. This being true, and we think it is, how could the relator have been actuated by any bad, fraudulent or vicious motive in doing an act that accomplished nothing, and that would have been followed by the same results whether done or left undone. Mr. Fowler, when he made this interlineation in the decree, could not have been actuated by any bad or fraudulent motive of unfair gain to himself or his client, or harm to anyone else, because the act done being wholly immaterial, was powerless to effect any result whatever. In the case of Hunt, Admr., vs. Adams, 6 Mass., 519, that was a suit upon a note, the defense to which set up an alteration of the note after it was made and delivered, by the unauthorized interlineation of the word "year" therein, Chief-Justice

Parsons, delivering the opinion of the court says: "Such addition has no effect in form or substance. In my opinion it would be unworthy of the wisdom of the law to decide, that the incautious interlineation of a word, which the same law would necessarily imply, should defeat the contract. Indeed, the assent of the party signing such contract, that the omission of a word by a clerical mistake, which the law will supply, might be cured by inserting such word, ought to be presumed, to protect him from the imputation of intentional fraud." There was no proof that Mr. Fowler made this interlineation under the impression or belief that it added to or detracted from the substance or form of the decree, or was necessary to give it effect. The omission of the words interlined was so manifestly a clerical oversight and mistake, and in the opinion of both the judge and the clerk of the court did not affect the description of the land or the decree either in form or substance, and the words interlined being such as the law would have supplied from the other contents of the decree, under the equitable view taken by Chief-Justice Parsons in the case quoted above, in considering the motive by which Mr. Fowler was actuated in making this interlineation, we might fairly presume that he did it under the impression that the judge would certainly consent to the correction of so palpable a clerical mistake,

that when made affected nothing either in form or sub-stance, rather than from any evil design.

We do not wish it to be understood that we are inclined to condone, palliate, countenance or excuse any manner of tampering with the decree of a court after it obtains the sanction of the judge's signature, even to the crossing of a T or the dotting of an I therein; on the contrary, we think that such a practice is highly reprehensible, and deserves severe punishment, no matter how innocent or immaterial the alteration or change may be. A proper respect for the sanctity of the official judgments and decrees of our courts demands this shall be so; and in recognition of the sanctity of judicial decrees, our chancery court rule 87 has been provided, requiring an order of the court for the correction of clerical mistakes in decrees arising from an accidental slip or omission. But when such an interference with a judicial decree is made unauthorizedly and incautiously, but without any bad motive or fraudulent design, it partakes more of the character of a contempt of the court, than of that moral turpitude that stamps the perpetrator as being an unfit person to exercise the office of an attorney. In the absence, therefore, of any evidence showing that the relator was actuated, in making the interlineation charged, by any bad motive or fraudulent design, we do not think that under the circumstances it either merited or warranted the infliction upon him of that severest and most humiliating of all punishments to an attorney-disbarment. Mr. Weeks, in his admira-

ble work on Attorneys, p. 159, in discussing the subject of disbarment, says: "The end to be attained is protection, not punishment. As punishment, removal from office is unreasonably severe, for those cases in which the end is reclamation, not destruction, and for which reprimand, suspension, fine, or imprisonment seem to be the more adequate instruments of correction; for expulsion from the bar blasts all prospects of prosperity to come, and mars the fruit expected from the training of a lifetime."

In the absence of any proof of moral turpitude on the relator's part in making the interlineation charged, we think that the sentence for his entirely unauthorized and highly reprehensible act should have been aimed at correction and reasonable punishment, as there were no elements in it that marked him as a corrupt practitioner against whom the public should be protected by destroying his official life as an attorney. The peremptory writ is awarded and ordered.